## LYON v. LYON.

1. An injunction will, in a meritorious case, lie at the instance of a wife who is suing her husband for a divorce on the grounds of cruel treatment and habitual intoxication, to restrain him not only from interfering with her property, but also from going into her dwelling-house and eating and sleeping therein over her protest and against her consent.
2. In the present case the court committed at the interlocutory hearing numerous errors in admitting in evidence against the plaintiff testimony which was palpably hearsay, which consisted of mere conclusions of the witness, and which was otherwise irrelevant and inadmissible.

Argued June 26, — Decided August 4, 1897.

Petition for injunction. Before Judge Fite. Bartow county. March 27, 1897.

Mrs. Lula T. Lyon brought her petition against Thomas J. Lyon for divorce, and prayed also that the defendant be enjoined and restrained from remaining or coming upon her property on which she resided, or into her house; from eating and sleeping there; from attempting any control over the tenants upon the place, or the proceeds, income, rents, issues and profits thereof; from taking, using, possessing, or interfering with her personal property; and from exercising any control or direction over their two minor children or interfering with her custody thereof; and for general relief. Upon the hearing of the application for the restraining order, the court ordered that the defendant be restrained and enjoined from interfering in any way with the laborers or tenants of the petitioner until the further order of the court, and that all the other prayers for injunction or restraint be refused. To this refusal and to other rulings hereafter set out the plaintiff excepted. She alleged that defendant treated her with great cruelty, and had done so for some time past, in the following besides other ways: by cursing, abusing, and unkindly and harshly speaking of and to her without excuse; by using profane, obscene and vulgar language and allusions to and of her in the presence of herself and others; by cursing, abusing, and harshly and unkindly speaking of and to his and her children, threatening with violence the persons of herself and their children, and threatening the life of their minor son and attempting to kill him without excuse or justification; by violent conduct in the home where they have been living, by drinking intoxicating liquors to such an extent as to make him violent, unpleasant, and disagreeable, and his company and association dangerous to the peace, persons and lives of herself and their children; by unjust, untrue, unkind and humiliating remarks and insinuations about herself and her conduct; by interfering with and mistreating her tenants. Defendant, though able-bodied and strong, failed and refused, and has for years past, to support herself and their children, two of whom are minors without estate. Defendant has no property, income or occupation. Petitioner received in advance and by inheritance from her father, who has been dead many years, a large estate, all of which is gone except

the home where she lives, a small amount of vacant town property which is worth very little and brings no income, and some wild lots small in value and yielding no revenue. The place where she lives was deeded to herself for life, with remainder to her children. It consists of about 200 acres of cultivated land, and the fee simple title is worth about $7,000, and the yearly income will be hardly sufficient to comfortably support herself and children and educate her youngest child, now six years old. Her father was very wealthy, and she was accustomed from infancy to the kindest treatment, and the best of living as to food, clothes and servants and the necessaries and luxuries of life. She is now living in reduced circumstances, and compelled to economize as never before. The farm on which she lives is rented out to tenants, and from these rents she gets what she uses for the support of herself and children. Defendant not only does not aid in the support of herself and children, but has for some time been supported from the proceeds of this farm entirely. With the aid of her son she has looked after this farm and the work of the tenants thereon, and the defendant is of no aid or assistance to her in this respect. On the contrary, he interferes with the tenants and can not get along with them, and some of them are now threatening to leave the place if he stays there and continues to act as he has. He has been a drinking man for some years, and within the last few years has drunk more at home than he formerly did, and is more easily and dangerously affected thereby. He insists on keeping whisky, against her entreaties, and sometimes is under its influence for several days at a time. During these drinking spells he becomes violent, dangerous, abusive, profane and threatening. Neither her life nor that of her two sons is safe at these times. Such occasions have occurred frequently within the last few months, and are liable to occur at any time. He feels intense bitterness and hatred toward their eldest son, and has several times threatened and attempted his life. This boy is twenty years old. His father beats him with his walking-stick, cowhides him with the buggy-whip, and has drawn deadly weapons upon him, threatening to kill him. She has told defendant of her intention to apply

for a divorce, and has endeavored to effect a peaceable and quiet separation, knowing the impossibility of their living peaceably together on account of his violence and cruelty to herself and children. This he refuses. He declares his intention to remain in her house, and refuses to go elsewhere. He has no right, title, interest or equity in the home wherein or the place whereon she resides, and she has made no contract to support him. She and defendant have not lived together as man and wife for some time, notwithstanding which he insists on coming to and staying at her house and eating and sleeping there, and using the same as his own property, and has announced his intention to continue to do so. Ordinary remedies by action for damages, ejectment, trespass, etc., are wholly inadequate to her protection, and a resort thereto would involve a multiplicity of suits. For the reasons stated the defendant is not the proper custodian for their minor children, both of whom prefer her custody to his.

The defendant answered, denying the allegations of the petition as to his conduct toward petitioner and her children or tenants, as to drunkenness at his home, and as to his failure and refusal to support petitioner and her children; and denied that there was cause for divorce or for an injunction. The evidence at the hearing was conflicting.

The following testimony from affidavits offered by the defendant was admitted in evidence over specified objections of plaintiff: From affidavit of W. E. Puckett: "On last Saturday I met on the street here in Cartersville Roxie Beaman, with her daughter Flonnie Jackson. I asked Roxie who was to blame for all that trouble at the Lyon home—was it Captain or Mrs. Lyon. She said, 'I am a negro, but I will tell you the truth. Mr. Puckett, before God, Miss Lula is to blame for it all.' She spoke in the kindest terms of Capt. Lyon, saying he had always been good to me and my family." Also: "I have always heard his [Capt. Lyon's] renters speak in the kindest terms of him, saying he was a good landlord and good to his renters and laborers." Also: "Roxie Beaman told me that she had talked to Miss Lula and tried to get her to stop all this trouble, but she wouldn't do it."

From affidavit of Nathan Beaman: "As much as I know the parties, I do not know of any reason for a separation or trouble between them."

From affidavit of Mrs. A. E. Jordan: "I had heard of some trouble between Capt. Lyon and his wife last fall, and asked Roxie Beaman, at my house, who was to blame for it, Capt. Lyon or his wife; and she told me then and there that Mrs. Lyon was to blame for it all, that she (Roxie) told Mrs. Lyon she would have to quit it before she died.. She said at the time that Capt. Lyon was treated like a dog, and it was a shame and a scandal before God the way his family treated him."

From affidavit of N. M. Adams: "I met young Tom Lyon on Saturday, the 27th of February. He told me in the presence of Elisha Glenn that his mother had employed Judge Akin to file suit. I told him that perhaps he was the cause of the trouble, and that if he would go off and go to work it would all be settled. He replied, 'We can't afford to be furnishing him in tobacco and clothes, and him doing nothing.'"

From affidavit of N. M. Adams: "Dave Mann told me that when he was driving Mrs. Lyon to town one day, soon after her daughter's marriage, that she told him that she was glad Cora had married so well, and if Capt. Lyon was to die or get out of the way she would marry some rich old fellow herself."

From affidavit of J. W. Yarbrough: "I have reason to know that Mrs. Lyon is a very disagreeable and high-tempered woman."

From affidavit of N. M. Adams: "The time I heard Capt. Lyon call Tom a coward was when he was telling me of the way he bluffed Tom with the gun that Tom knew was not loaded. And then he only said, laughing, that he knew the coward would run."

From affidavit of defendant: "Each one of them [referring to Roxie Beaman, Nathan Beaman, and Flonnie Jackson] said to Mr. Griffin, the sheriff, and myself, that they had never seen me drunk and never heard me abuse or speak ill of my wife in their lives."

From affidavit of R. L. Griffin: "I personally saw each of the following witnesses and heard them say that day that they

had never heard Capt. Lyon curse or abuse his wife or daughter in their lives, and they were summoned as witnesses for Capt. Lyon. The witnesses who I heard say that are as follows: Roxie Beaman, Flonnie Jackson, Bill Jackson, Nathan Beaman, Wade Carson. They all told me they knew nothing about the troubles between Capt. Lyon and his wife."

From affidavit of R. L. Griffin, after detailing what the witnesses had said to him in Capt. Lyon's presence: "Capt. Lyon told each of them that he only wanted the truth told."

Plaintiff proposed to examine Roxie Beaman, Nathan Beaman, George Henry Beaman, and Wade Carson, affidavits from whom, more or less conflicting, were read by each side, and to show by these witnesses that their affidavits read by the plaintiff contained what they really meant to swear. Defendant's counsel consented to this, but the court refused to allow the examination and evidence.

*John W. Akin* and *Albert S. Johnson,* for plaintiff.
*J. W. Harris,* for defendant.

FISH, J. 1. While courts of equity are reluctant to interpose in controversies growing out of merely personal or domestic relations, and will ordinarily leave the parties to pursue the remedies open to them in the courts of common law, still when "property rights or questions concerning property arise between husband and wife, parent and child, [or] guardian and ward," jurisdiction will be taken, in a proper case, in order that full and adequate relief may be granted to the injured party. See 1 Pom. Eq. Jur. (2d ed.) § 99. Thus, "where a husband, by a post-nuptial deed, settles a house and business to the separate use of his wife, to be managed by her for the benefit of herself as if a feme sole, he can be restrained from in any way interfering with the business, and even from entering the house." 10 Am. & Eng. Enc. L. 984, citing Wood *v.* Wood, 19 W. R. 1049. "The aid of equity by injunction is most frequently sought, as between husband and wife, in cases of application for divorce from the bonds of matrimony; and it may be stated, as a general rule, that pending proceedings for divorce, a proper case of emergency being shown, the hus-

band may be enjoined from interfering with the custody of the children or of property in possession of the wife." 2 High, Inj. (2d ed.) § 1393, citing Wilson v. Wilson, Wright (Ohio), 129, and Edwards v. Edwards, Ibid. 308. See also, in this connection, Holmes v. Holmes, 4 Barb. 295, in which Barculo, J., on page 297, said: "The rule of the court of equity, in such cases, follows that of natural justice: the husband, by his violation of the marriage contract, forfeits all equitable right to the wife's property. Even when the property has belonged to her before the separation, and has been reduced into actual possession by the husband, courts of equity will restore it to the wife. Much more, in a case like the present, when the property falls to the wife after the separation, should the equitable power of the court be interposed to prevent the husband from receiving it by virtue of that relation which he himself has disregarded and violated. It would be difficult to conceive of a more plain and palpable outrage upon justice than to permit this old lady to be deprived of her whole share of her father's estate, by an exercise of his marital rights on the part of a husband whose cruelty has driven her from an honorable home and occasioned a permanent suspension of the marriage contract. The authorities are full on this subject." Citing Van Duzer v. Van Duzer, 6 Paige, 366; Fry v. Fry, 7 Id. 461; Renwick v. Renwick, 10 Id. 420. This same equitable doctrine is recognized and enforced in the English Courts of Chancery. See Symonds v. Hallett, 24 L. R. Ch. Div. 346, s. c. 53 L. J. Ch. 60, 49 L. T. 380. There it appeared that: "On a marriage a leasehold house was settled upon the usual trusts for the wife for life, for her separate use, and the husband and wife continued to reside in the house. Differences arose between them, they ceased to cohabit, and the wife instituted proceedings for divorce or judicial separation. The husband claimed the right to go to and use the house when and as he thought fit, not for the purpose of consorting with his wife, but for his own purposes. In an action by the wife against the trustees and her husband, claiming administration of the trusts of the settlement and an injunction to restrain the husband from entering the house, [it was] held

that, under the circumstances, the wife was entitled to an interim injunction."

When, pending a libel for divorce instituted by the wife, she is living in a state of separation from her husband, it may be said that the latter's marital rights are, for the time being, suspended, as he is not at liberty to interfere either with her person or her property. "One carrying on a suit for any form of divorce can not be cohabiting with the defendant; for thus he would condone the offence, or affirm the marriage sought to be set aside, or otherwise contravene in pais his act in court." 1 Bish. Mar., Div. & Sep. § 1757. It is not only the privilege, but the duty, of a wife to live apart from her husband, when he has been guilty of conduct entitling her to a divorce which she has not condoned. Harper *v.* Harper, 29 Mo. 301; Burns *v.* Burns, 60 Ind. 259; Sykes *v.* Halstead, 1 Sanford (N. Y.), 483. For "a regard for public decency, as well as the settled usage of the court, requires that under such circumstances the parties should not live together." Marsh *v.* Marsh, 14 N. J. Eq. 315. It must oftentimes prove a hardship upon the wife to leave her husband's house and seek an asylum elsewhere. To compel her to give up a home which she herself has provided with her own separate means would amount to intolerable injustice. So, in such a case, the husband having by his own gross misconduct forced the wife to bring about a separation, it must follow that he, and not she, must go forth into the world, leaving the home they had previously shared in common to the enjoyment of its rightful owner. To protect the wife, under such circumstances, against unlawful interference on the part of her husband, during the pendency of a libel for divorce brought against him, would seem to be peculiarly within the province of a court exercising equity jurisdiction.

Under the practice which obtains in this State, a prayer for the requisite equitable relief may be joined with the wife's application for divorce in one and the same petition. In Georgia, since the passage of the married woman's act of 1866, the husband has absolutely no interest, legal or equitable, in property belonging to a wife's separate estate. She is not now—indeed she has never been—under any legal duty to provide for her

husband's support. *Ainsworth* v. *Ainsworth*, 37 *Ga.* 627, 634. Upon what pretense, then, can a husband who has cruelly wronged his wife and thus relieved her of even any moral obligation to provide for him, claim the right to occupy with her premises of which she is the sole and undisputed owner, during the pendency of proceedings whereby she seeks a total divorce?

2. In the present case, it appears that much evidence which was clearly inadmissible was admitted over proper objections thereto urged by the plaintiff. The reporter's statement sets forth the evidence alluded to, much of which was palpably hearsay, and a portion of which consisted of mere conclusions on the part of the witnesses and was otherwise objectionable. The error thus committed demands that the case should undergo another investigation, which should be conducted in the light of the law as above announced.

*Judgment reversed. All the Justices concurring.*